687 F.2d 1150
 SOUTH EASTERN HUMAN DEVELOPMENT CORPORATION, a non-profit
South Dakota Corporation, Appellant,
v.
Richard S. SCHWEIKER, Secretary of the Department of Health
and Human Services, an agency of the United States of
America; Robert L. Trachtenberg, Acting Director of the
Office of Community Services of the Department of Health and
Human Services; The United States of America; William J.
Janklow, Governor of the State of South Dakota; The South
Dakota State Planning Bureau and Dana Nelson, Appellees.
 No. 82-1241.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 18, 1982.
Decided Aug. 27, 1982.
 
 Philip N. Hogen, U. S. Atty., Sioux Falls, S. D., Dawn Bowen, Asst. U. S. Atty., Pierre, S. D., for appellees Richard S. Schweiker, Robert L. Trachtenberg and The United States of America; Vicki Schulkin, Dept. of Health and Human Services, Washington, D. C., on brief.
 Jeff Masten, Masten, Myrabo & Irons, P. C., Canton, S. D., for appellant, South Eastern Human Development Corp.
 Mark V. Meierhenry, Atty. Gen., Jeffrey P. Hallem, Asst. Atty. Gen., Pierre, S. D., for State appellees.
 Before HEANEY and ARNOLD, Circuit Judges, and REGAN,* Senior District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 South Eastern Human Development Corporation appeals from an order of the district court denying its motion for a preliminary injunction and dismissing its complaint for failure to state a claim on which relief can be granted. We reverse and remand to the district court for the entry of appropriate relief.
 
 I.
 INTRODUCTION
 
 2
 This legal dispute has its origin in the debate recently waged in Congress over the proper means of delivering federal social service funds to the citizens of the various states. The statute at issue, the Omnibus Budget Reconciliation Act of 1981 (OBRA) represents a victory for those seeking to minimize federal involvement in the disbursement of such funds. The Act establishes seven block grants to be administered by the states in conformance with certain minimal federal requirements. The block grants replaced a large number of categorical grant programs previously administered directly by the federal government.
 
 
 3
 The question presented here is a narrow one: What procedure must a state follow in order to receive funds for fiscal year 1982 under the block grant program created to fund community services?
 
 II.
 STATUTORY SCHEME
 
 4
 Title VI of the OBRA establishes the Community Services Block Grant Program. The Act authorized the appropriation of $389,375,000 for fiscal year 1982 and for each of the four succeeding fiscal years for the purpose of "ameliora(ting) the causes of poverty in communities within the State." Omnibus Budget Reconciliation Act of 1981, Pub.L.No.97-35, § 672(a) & (b), 95 Stat. 511 (1981) (hereinafter OBRA). The Community Services Block Grant replaces the categorical grants authorized by the Economic Opportunity Act of 1964; that Act was in large part repealed by the OBRA. OBRA, supra, § 683(a) at 95 Stat. 519.
 
 
 5
 Section 675(a) of Title VI specifies that "(e)ach State desiring to receive an allotment for a fiscal year under this subtitle shall submit an application to the Secretary." The application must contain assurances by the chief executive officer of the state that the state will comply with the public hearing requirement of section 675(b), described as follows:
 
 
 6
 (b) After the expiration of the first fiscal year in which a State received funds under this subtitle, no funds shall be allotted to such State for any fiscal year under this subtitle unless the legislature of the State conducts public hearings on the proposed use and distribution of funds to be provided under this subtitle for such fiscal year.
 
 
 7
 The application must also contain assurances that the state will make community service grants only to qualifying[1] organizations, and only for specified purposes[2] relating to the amelioration of poverty. OBRA, supra, § 675 at 95 Stat. 513-516. Subsection (d) of section 675 further provides that the state "shall prepare and furnish to the Secretary a plan which contains provisions describing how the State will carry out" its intended use of the funds. The state's plan "shall be made available for public inspection within the State in such a manner as will facilitate review of, and comment on, the plan." OBRA, supra, § 675(d)(2) at 95 Stat. 515.
 
 
 8
 In fiscal year 1982 only, a state may choose either to administer the Community Services Block Grant or to have the state's allotment distributed by the Secretary through the programs authorized by the repealed Economic Opportunity Act of 1964. Section 682(b)(3) of Title VI's "transition provisions" provides that
 
 
 9
 (e)ach State which, pursuant to paragraph (1), determines to have the Secretary operate programs under the provisions of law in effect on September 30, 1981, (the EOA) but repealed by section 683(a), shall give notice to the Secretary of such determination. Such notice shall be submitted to the Secretary prior to the beginning of the first quarter of fiscal year 1982 and at least 30 days before the beginning of any other quarter during such fiscal year. For purposes of this section, the quarters for fiscal year 1982 shall commence on October 1, January 1, April 1, and July 1 of fiscal year 1982.
 
 
 10
 Subtitle C of Title XVII, Chapter 2, entitled "Block Grant Funds" establishes procedural requirements that must be followed by the states when administering any of the block grants created by the OBRA. The two requirements relevant to this appeal-"reports on proposed use of funds" and "public hearings"-are set out in section 1742:
 
 
 11
 (a) Each State shall prepare a report on the proposed use of block grant funds received by that State, including (1) a statement of goals and objectives, (2) information on the types of activities to be supported, geographic areas to be served, and categories or characteristics of individuals to be served, and (3) the criteria and method established for the distribution of the funds, including details on how the distribution of funds will be targeted on the basis of need to achieve the purposes of the block grant funds. Beginning in the fiscal year 1983, the report required by this subsection shall include a description of how the State has met the goals, objectives, and needs in the use of funds for the previous fiscal year as identified in the report prepared pursuant to this subsection for that previous fiscal year.
 
 
 12
 (b) The report prepared by a State pursuant to subsection (a), and any changes in such report, shall be made public within the State on a timely basis and in such manner as to facilitate comments from interested local governments and persons.
 
 
 13
 (c) No State may receive block grant funds for any fiscal year until the State has conducted a public hearing, after adequate public notice, on the use and distribution of the funds proposed by the State as set forth in the report prepared pursuant to subsection (a) with respect to that fiscal year.
 
 
 14
 OBRA, supra, § 1742 at 95 Stat. 763.
 
 
 15
 The "transition provision" of Chapter 2 provides:
 
 
 16
 (a) In the fiscal year 1982 only, each State shall certify to the responsible Federal agency that it is in compliance with section 1742 and that it is prepared to use all or part of available block grant funds. Such certifications shall be submitted to the responsible Federal agency prior to the beginning of the first quarter of the fiscal year 1982 or at least 30 days before the beginning of any other quarter of that fiscal year. For purposes of this section, the quarters for the fiscal year 1982 shall commence on October 1, January 1, April 1, and July 1 of the fiscal year 1982.
 
 
 17
 (b) Except as otherwise provided in this Act, until such time as the responsible Federal agency receives a certification from a State pursuant to subsection (a), such agency shall distribute the block grant funds involved for programs to which the funds relate and which are discontinued by this Act * * *.
 
 
 18
 OBRA, supra, § 1743 at 95 Stat. 763-764.
 
 III.
 FACTUAL BACKGROUND
 
 19
 The OBRA was signed into law by President Reagan on August 13, 1981. On September 2, 1981, South Dakota Governor William Janklow notified the Secretary of Health and Human Services that South Dakota had elected to administer the Community Service Block Grant during the "transition year" effective October 1, 1981. The governor appointed a task force to make recommendations as to how fiscal year 1982 funds should be spent. No public hearings were held.
 
 
 20
 On December 11, 1981, South Dakota submitted its Community Service Block Grant plan and report to the Secretary. The document contained the necessary assurances outlined in section 675(c) of Title VI and provisions describing how the assurances would be carried out, as well as a report on the proposed use of the community service block grant funds as required by section 1742(a) of Title XVII. The Secretary informed South Dakota officials on December 14, 1981, that the report and plan "meets all of the conditions of Public Law 97-35 (the OBRA)." T.R.O., Exhibit 6, Civ. 81-3072. The Secretary subsequently issued a letter of credit enabling South Dakota to distribute its community service funds.
 
 
 21
 In fiscal year 1981, South Dakota had received $1,633,413 in community service funds, which it used to fund six community service action programs. The state's share under the Community Service Block Grant was considerably less: $408,516. As a result of this drastic cut in federal funds, South Dakota decided to fund only three of the six existing community service action programs. Appellant South Eastern Human Development Corporation (SEHDC) was one of the three programs whose funding was terminated.
 
 
 22
 SEHDC filed this action in federal district court on December 8, 1981. SEHDC's complaint alleged that the state defendants had failed to comply with sections 1742 and 1743 of the OBRA for the first two quarters of fiscal 1982 in two respects: (1) the state's section 1742 report was filed after October 1, 1981, and December 2, 1981, the deadlines for the first two fiscal quarters; (2) no public hearings were held regarding fiscal 1982 community service funds. SEHDC claimed that because sections 1742 and 1743 were not complied with, the Secretary was obligated under section 1743(b) to distribute South Dakota's block grant allotment in accordance with section 221 of the Economic Opportunity Act of 1964. SEHDC sought, inter alia, preliminary injunctive relief to prevent South Dakota from distributing, expending or receiving any Community Service Block Grant funds and an order directing the Secretary to transfer to SEHDC the funds SEHDC would have received under section 221 for the disputed period.
 
 
 23
 On December 23, 1981, the district court entered an order temporarily restraining South Dakota from distributing, expending or receiving its community service block grant funds. On January 13, 1982, the court held a hearing to consider plaintiff's motion for preliminary injunctive relief, and the federal and state defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted. The court rejected plaintiff's contention that South Dakota had to timely comply with section 1742's report and public hearing requirements. Accordingly, the court held that there was not a probability that plaintiff would succeed on the merits of its claim,[3] so that preliminary injunctive relief was inappropriate, and further, that plaintiff had failed to state a claim on which relief could be granted. SEHDC appeals.
 
 
 24
 The appellants argue that once South Dakota informed the Secretary of its intent to administer the Community Service Block Grant, it was obligated to prepare a report on the proposed use of the funds and hold a public hearing, and do both within the timetable set out in section 1743(a). We will focus first on the 1742(a) plan requirement.
 
 IV.
 TIME REQUIREMENT FOR SUBMISSION ON STATE PLAN
 
 25
 All parties agree that South Dakota was obligated to submit a plan on the proposed use of its Community Service Block Grant funds that contained all the information required by section 1742(a). The Secretary's block grant regulations specify that such a plan must be submitted, and South Dakota did comply in its December 11, 1981 report to the Secretary. 45 C.F.R. § 96.10. The parties part company, however, on the question of when this report must be submitted and what the Secretary must do until it is submitted.
 
 
 26
 The federal and state defendants claim that once the governor notified the Secretary that the state had elected to administer the Community Service Block Grant programs, the "transition provisions" of Title VI (§ 682) became controlling, and not the timetable set out in the "transition provision" of Title XVII (§ 1743). They rely on the maxim that specific provisions prevail over general provisions contained in the same statute, e.g., Hickman v. Cliff Peck Chevrolet, Inc., 566 F.2d 44, 47 (8th Cir. 1977), arguing that because section 682 relates specifically to the Community Service Block Grant, and section 1743 to all block grants generally, the former controls. The defendants conclude that because the state notified the Secretary before October 1, 1981, of its intent to administer the block grant, as required by section 682, the Secretary was obligated to hold the state's block grant funds until the state supplied its section 675 application, and not distribute the funds pursuant to the repealed EOA programs.
 
 
 27
 We disagree. We find no inconsistency between the transition provisions of Title VI and those of Title XVII, and, therefore, see no reason to emasculate one in favor of the other. Section 682 of Title VI establishes the procedure to be followed if a state chooses not to administer its Community Service Block Grant. The section makes no reference to the procedure to be followed in the opposite situation, much less to the timetable for those procedures. Section 682's provisions do not, therefore, conflict with the state's obligation under section 1743(a) to submit its plan by October 1, 1981, or 30 days before the start of the other fiscal quarters, in order to receive block grant money for those quarters. When it is possible, as it is here, to give effect to both provisions of a statute at issue, this Court must do so. See Woodfork v. Marine Cooks and Stewards Union, 642 F.2d 966, 970-971 (5th Cir. 1981); Citizens to Save Spencer Cty. v. U. S. Environ., Etc., 600 F.2d 844, 870 (D.C.Cir.1979).
 
 
 28
 Our interpretation of sections 682 and 1742-1743 is consistent with that adopted earlier by the Secretary. In the preamble to the rules and regulations implementing the block grant programs, the Secretary stated:
 
 
 29
 In order to receive funds for the quarter beginning October 1, 1981, a State's application and related submission (later defined to include the section 1742(a) report) must be received by the Department by September 30, 1981, in the case of communities services * * * block grants.
 
 
 30
 With respect to the four block grants subject to the transition provisions, the Department will operate the programs replaced by each block grant generally in accordance with current policies until a State qualifies for the block grant.
 
 
 31
 Preamble, 45 C.F.R. § 96 (1981), 46 Fed.Reg. 48583, Oct. 1, 1981 (emphasis added).
 
 
 32
 We think these paragraphs reflect the Secretary's view, now disavowed on appeal, that a state's application and necessary submission must be received by October 1, 1981, to preserve the state's right to distribute the first quarter's funds, and further, that the Secretary must continue to fund EOA grantees until a state "qualifies"-i.e., submits its section 1743(b) certification-for the block grant.
 
 
 33
 The appellees rely on a statement in the House Conference Report accompanying the OBRA that "(a)ny transition provision contained in a block grant program authorized by this Act shall supersede (section 1743)." H.Conf.Rep.No.208, 97th Cong., 1st Sess. 923, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 1285. We think it unreasonable, however, to infer from this statement that Congress intended section 682 to supersede 1743 in the situation that section 682 does not even address-i.e., when the state notifies the Secretary of its intent to administer the block grant. We consider the conferees' statement relevant only in those instances when a transition provision addressed to a specific block grant conflicts with the general block grant transition provisions. To hold otherwise would undermine Congress' intent, expressed elsewhere in the report, to provide at least some reporting and public participation mechanisms for the benefit of the states' citizens:
 
 
 34
 The purpose of (sections 1741-1743) is to provide for a participation and reporting process at the State level to help assure that local governments, interested individuals and groups within a State have an opportunity to comment on planning for the expenditure of block grant funds authorized in this Act. These sections provide minimum requirements and are not intended to supersede more detailed reporting and participation provisions that may be part of individual block grants contained in this Act.
 
 
 35
 H.Conf.Rep.No.208, 97th Cong., 1st Sess. 921-922, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 1283-1284.
 
 
 36
 Furthermore, we agree with the appellant that giving effect to section 1743 for community service block grantees also provides a more orderly transition between the federal government's administration of categorical grants and the states' assumption of the block grant programs. Under section 1743, the federal government continues to fund the categorical grant programs until the state is prepared to administer its block grant funds. That is clearly more logical than for the Secretary to "sit on" a state's community service funds for 1, 2 or 3 fiscal quarters while the state determines its proposed use of those funds.
 
 V.
 PUBLIC HEARING REQUIREMENT
 
 37
 The appellant's second complaint below was that the South Dakota officials had failed to conduct public hearings on its proposed use of the Community Service Block Grant funds as required by section 1742(c). They argue that because South Dakota failed to certify its compliance with this requirement, the Secretary was required to fund current EOA community service programs pursuant to section 1743(b).
 
 
 38
 The district court held that a state need not conduct hearings regarding 1981 funds, again reasoning that the "specific" statutory provision, section 675(b), should prevail over section 1742(c), the general one.
 
 
 39
 We do not agree that section 1742(c) does not apply to community service block grantees. That section mandates public hearings in all years a state receives block grant funds, but permits either the executive or legislative branch to hold the hearings. Section 675(b) requires hearings to be held by "the legislature of the State" "(a)fter the expiration of the first fiscal year" in which a state receives Community Service Block Grant monies. Both of these provisions must be given effect because there is no conflict between them. See Woodfork v. Marine Cooks and Stewards Union, supra, 642 F.2d at 970-971; Citizens to Save Spencer Cty. v. U. S. Environ., Etc., supra, 600 F.2d at 870. The most logical reading of these two provisions is that in the first fiscal year in which a state receives block grant funds, the executive branch must conduct public hearings and that, thereafter, the state's legislature must do so.
 
 
 40
 Although the legislative history of the OBRA does not discuss the relationship between the mandates of sections 675(b) and 1742(c), the conference committee's views on section 675(b) suggest why the legislature is not required to hold hearings in the first year:
 
 
 41
 The committee has intended to underscore at every appropriate instance its expectation that block grant funds should be allocated in an open and democratic way. For example, after the first fiscal year, the State legislature must conduct public hearings on the allocation of block grant funds. This is not intended to disrupt a state's usual patterns for conducting legislative business. In the cases where a legislature meets only every second year or for only brief periods each year, the committee expects that legislatures will meet the public hearing requirement by assigning the responsibility to a legislative committee, interim committee or other means traditional to the State.
 
 
 42
 S.Rep.No.139, 97th Cong., 1st Sess. 908-909, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 932-933.
 
 
 43
 Thus, it is apparent that the Senate did not want to impose a public hearing requirement on the state legislatures in the first fiscal year of the block grants because some of those bodies would not even convene in that first year.
 
 
 44
 There is no similar reason, however, why the states' executive branches cannot hold the hearings required by section 1742(c). To relieve them of that responsibility would undermine Congress's efforts to
 
 
 45
 assure that (1) block grant funds are allocated for programs of special importance to meet the needs of local governments, their residents, and other eligible entities, and (2) all eligible urban and rural local governments, their residents, and other eligible entities are treated fairly in the distribution of such funds(.)
 
 
 46
 OBRA, supra, § 1741(a) at 95 Stat. 762.
 
 
 47
 We are aware that the Secretary has reached a contrary conclusion. In the preamble to the Secretary's rules and regulations implementing the block grants, it is stated:
 
 
 48
 No hearings are required for a State to receive its first year's allotments. Although section 1742(c) of the Act establishes a general requirement for public hearings during the first year for block grants, that provision is superseded by the specific provisions elsewhere in the Act exempting the first year from the requirement for a public hearing.
 
 
 49
 Preamble, 45 C.F.R. § 96 (1981), 46 Fed.Reg. 48583, Oct. 1, 1981.
 
 
 50
 We ordinarily give deference to the interpretation given a statute by the officers or agency charged with its administration. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Blue Cross Ass'n v. Harris, 622 F.2d 972, 978 (8th Cir. 1980). Where, however, the agency's interpretation is clearly wrong-as it is here-that interpretation can be accorded no weight. Hodgson v. Bd. of County Com'rs., County of Hennepin, 614 F.2d 601, 615 (8th Cir. 1980).
 
 
 51
 It appears from the record that our holding that the district court erred in ruling that community service block grantees need not comply with sections 1742 and 1743 is dispositive of this litigation. We therefore remand to the District Court with directions to it to order the Secretary to carry out his duty under Section 1743(b) to distribute to the affected agencies the funds they would have received for the first two quarters of fiscal year 1982 pursuant to the repealed provisions of the EOA.
 
 
 
 *
 The Honorable John K. Regan, Senior District Judge, United States District Court for the Eastern District of Missouri, sitting by designation
 
 
 [1]
 In fiscal year 1982, ninety percent of a state's funds must go to "eligible entities;" i.e., to organizations that were officially designated as a community action agency or community action program as of 1981 under the Economic Opportunity Act. Omnibus Budget Reconciliation Act of 1981, Pub.L.No.97-35, § 675(c)(2)(A)(i), 95 Stat. 514 (1981) (hereinafter OBRA)
 
 
 [2]
 The state must agree to use the Community Service Block Grant funds:
 (A) to provide a range of services and activities having a measurable and potentially major impact on causes of poverty in the community or those areas of the community where poverty is a particularly acute problem;
 (B) to provide activities designed to assist low-income participants including the elderly poor-
 (i) to secure and retain meaningful employment;
 (ii) to attain an adequate education;
 (iii) to make better use of available income;
 (iv) to obtain and maintain adequate housing and a suitable living environment;
 (v) to obtain emergency assistance through loans or grants to meet immediate and urgent individual and family needs, including the need for health services, nutritious food, housing, and employment-related assistance;
 (vi) to remove obstacles and solve problems which block the achievement of self-sufficiency;
 (vii) to achieve greater participation in the affairs of the community; and
 (viii) to make more effective use of other programs related to the purposes of this subtitle;
 (C) to provide on an emergency basis for the provisions of such supplies and services, nutritious foodstuffs, and related services, as may be necessary to counteract conditions of starvation and malnutrition among the poor;
 (D) to coordinate and establish linkages between governmental and other social services programs to assure the effective delivery of such services to low-income individuals; and
 (E) to encourage the use of entities in the private sector of the community in efforts to ameliorate poverty in the community(.)
 OBRA, supra, § 675(c)(1) at 95 Stat. 513-514.
 
 
 [3]
 See Dataphase Systems, Inc. v. C L Systems, 640 F.2d 109, 113 (8th Cir. 1981)